**WILLIAM R. SATTERBERG, JR. (F0381)**
**Law Offices of William R. Satterberg, Jr.**
Suite 2-C Sablan Building
PMB 131 Box 10000
Saipan, MP 96950
Tel. No. 670-234-9005
Fax No. 670-235-9007
email: bill@satterberg.net

**and**

**MATTHEW T. GREGORY (F0205)**
**Law Office of Matthew T. Gregory, LLC**
Suite 2-C Sablan Building
Beach Road, Chalan Kanoa
PMB 419 PPP Box 10000
Saipan, MP 96950
Tel. No. 670-234-9006/5
Fax No. 670-235-9007

*Attorney for: Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE**
**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS, <br><br> Plaintiff, <br><br> vs. <br><br> LEO A. DALY COMPANY, <br><br> Defendant. | CASE NO. 1:09-cv-00020 <br><br> **PLAINTIFF'S OPPOSITION TO LEO A. DALY COMPANY'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR MORE DEFINITE STATEMENT; AND OPPOSITION TO MOTION FOR CHANGE OF VENUE** <br><br> HEARING: December 3, 2009 <br> TIME: 9:00 a.m. |

Defendant, Leo A Daly Company [LADCO] filed combined motions pursuant to FRCP 12(b)(6) and 12(e), seeking either to dismiss, or for an order for a more definite statement of pleading, and also to transfer venue pursuant to 28 USCA § 1404(a). Plaintiff, Commonwealth of the Northern Mariana Islands [CNMI], opposes all motions as follows.

1

**Opposition to Motion to Dismiss, or for More Definite Statement**

LADCO's Motion correctly notes that the Complaint alleges facts that sufficiently provide notice of Defendant's breach of contract. In spite of that, the Defendant would also like a definite statement alleging professional negligence, even though the Complaint, in fact, alleges facts that constitute professional negligence, as well as negligent design. In opposition, Plaintiff submits that the Complaint gives LADCO fair notice of what Plaintiff's claims are, and the grounds upon which it rests. The Supreme Court has long held that the notice pleading under Rule 8 does not require a claimant to set out in detail the facts upon which he bases his claim. Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed. 2d 80 (1957). Suffice it to say that the Complaint in this case allows the Defendant to know what conduct the suit addresses, enabling LADCO to form an appropriate answer.

For a Complaint to survive a motion to dismiss, the non-conclusory "factual content," and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief. Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009). In this case, the factual allegations (defective design that failed to meet codes, as well as earthquake and design standards and requirements; a failure to remedy defects) reasonably infer negligent design, professional negligence, as well as breach of contract. That being the case, the Motion to Dismiss for failure to state a claim upon which relief can be granted must be denied. For the same reasons, the Motion for More Definite Statement must also be denied.

The courts have construed Rule 12(e) Motions for More Definite Statement narrowly and consider it a disfavored motion, limiting it to situations where the complaint is unintelligible. A Rule 12(e) motion is not a substitute for discovery. Rather, such a

motion attacks unintelligibility in a pleading, not mere lack of detail. If the detail sought by a motion for more definite statement is obtainable through discovery, the motion should be denied. Valesquez v. HSBC Finance Corp., No. 08-4592 SC, 2009 WL 112919 (N.D.Cal. Jan.16, 2009).

Regardless, the Motion to Dismiss or, in the Alternative, Motion for More Definite Statement should be denied as being no longer relevant. The Plaintiff is filing contemporaneously herewith its Amended Complaint pursuant to FRCP Rule 15(a)(1)(A).

**Opposition to 28 USCA § 1404(a) Motion for Change of Venue**

At the outset, it should be noted that LADCO's Motion for Change of Venue is not accompanied by a motion to extend the time for a responsive pleading. Instead, LADCO appears to be relying on the tolling of its Answer until the court rules on the 12(b)(6) and 12(e) motions. Assuming the court is of the view that deciding the § 1404(a) motion at this time is warranted out of an interest in judicial economy, Plaintiff is confident that the court will, of course, entertain the § 1404(a) motion in a prompt fashion after being fully advised. However, it must also be recognized that the Plaintiff deserves an answer. The filing of a 28 USCA § 1404(a) motion does not, itself, extend the time for LADCO's Answer to the Amended Complaint beyond what is provided in FRCP Rule 12(a)(4), and does not justify any failure on the part of the Defendant to file its Answer.

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district where it might have been brought. 28 USCA § 1404(a). It is undisputed that the Plaintiff's choice of venue in the District Court for the Northern Mariana Islands is permissible under the rules of personal jurisdiction and

3

venue. It <u>is</u> disputed, however, that the Plaintiff's choice is inconvenient. Rather, the interests of justice favor the venue choice in the District Court of the N. Marian Islands.

The <u>Motion for Change of Venue</u> correctly notes that the Plaintiff's choice of venue should rarely be disturbed, unless the balance is <u>strongly in favor of the Defendant</u>. <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). The district court has discretion to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness. <u>Jones v. GNC Franchising, Inc.</u>, 211 F.3d 495, 498 (9th Cir. 2000). The case-by-case considerations listed in <u>Gilbert</u>,[1] however, are not found anywhere in LADCO's <u>Motion for Change of Venue</u>. Rather, the <u>Motion</u> relies on two general bases for its argument for change of venue: 1) convenience and judicial administration; and 2) the interests of justice as a result of pre-trial publicity. However, because "the defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum,"[2] and the Defendant has failed to make even a <u>small</u> showing of inconvenience, the <u>Motion for Change of Venue</u> must be denied.

Without any supporting affidavits, the <u>Motion</u> states that most of LADCO's design subconsultants on the Commonwealth Health Center project are located in Honolulu, a distance of nearly 4,000 miles from the Commonwealth of Northern Marianna Islands. A footnote lists the name of one company, and two individuals. <u>See</u> <u>Motion</u> at page 8. Presumably, the Defendant is suggesting that some of the Honolulu-based individuals may be called as witnesses to depositions or trial, although such is not directly stated. Other than

---

[1]   In applying the doctrine of "forum non conveniens," the <u>Gilbert</u> Court listed eight factors, at 330 U.S. 508-09. <u>See</u> also <u>Jones v. GNC Franchising, Inc.</u>, 211 F.3d 495, 498-99 (9th Cir. 2000).

[2]   <u>Decker Coal Co. v. Commonwealth Edison Co.</u>, 805 F.2d 834, 843 (9th Cir. 1986).

the fact the one of Defendant's offices, out of 30 in the entire world,[3] is located in Honolulu, and that relevant documents are purportedly now stored in Honolulu, the Defendant is not asserting any other "convenience" that would be served by changing venue in this case. The Defendant's argument misses the mark. It is not the Defendant's "convenience" that warrants a venue change. Rather, "the defendant must make a strong showing of <u>inconvenience</u> to warrant upsetting the plaintiff's choice of forum,"[4]

Although discovery has not yet begun in this suit, at this juncture the Plaintiff is contemplating calling 83 witnesses to trial, at least 49 of whom are from the Commonwealth of the Northern Mariana Islands -- more specifically -- Saipan. *See Declaration of William R. Satterberg, Jr.* Moreover, the construction contractor on this project and its personnel all reside in Saipan. The Request for Proposal was issued from Saipan, and it cannot be disputed that the reasonable expectations of all responders would be that they would be traveling to the Commonwealth of the Northern Mariana Islands, and not to the states of Hawaii or Texas, or even the Territory of Guam. The original design selection team resides in Saipan, as do the physicians and staff who work at the Commonwealth Health Center, as well as the people who have encountered difficulties due to the unavailability of the new dialysis treatment center. *Declaration of William R. Satterberg, Jr.*

Under the Defendant's theory of "convenience to the Defendant," a significant amount of forum shopping on the Defendant's part potentially could be taking place, considering that LADCO has offices in 30 locations worldwide. It also would be convenient

---

[3] See http://www.leoadaly.com/landing.aspx?wpage=locations, last visited November 3, 2009, where Leo A. Daly Company boasts 30 offices worldwide.

[4] <u>Decker Coal Co. v. Commonwealth Edison Co.</u>, 805 F.2d at 843 (emphasis added).

5

to the Defendant to ship its documents to any one of its 30 offices where venue is more favorable to LADCO's case. However, the greatest advantage to the Defendant in selecting Honolulu, or even Guam, is that it puts the Plaintiff and at least 100 witnesses to significant inconvenience in having to travel for hearings and trial, as well as depositions.

Among other factors to be considered by the court are a number of public interest considerations listed in Gulf Oil Corp. v. Gilbert, 330 U.S. at 508-09:

> Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

Unlike venues such as Maryland, the District Court for the Northern Mariana Islands is not a hot-bed of corporate litigation, but is experienced and well-adapted to litigation of the size and type involved in the above-captioned matter. The District Court is equipped with the latest technology to allow the presentment of digitized information. Also, rather than impose jury duty on citizens of Guam or Honolulu, communities that have no relationship to the Commonwealth Health Center, the people of the Commonwealth of the Northern Mariana Islands are best suited to decide the controversy

arising out of their own locale. Also, inasmuch as the laws of the Commonwealth of the Northern Mariana Islands will govern the case, regardless, it is more appropriate to hold the case in the Northern Mariana Islands where the controlling law is most familiar.

Regarding the convenience to LADCO in changing venue to its office location in Honolulu, where its documents are represented as being stored, an older 9th Circuit case out of Guam is worthy of the court's attention. American Pacific Dairy Products v. Siciliano, 234 F.2d 74 (9th Cir. 1956), involved an individual who alleged breach of a partnership agreement against a corporation. The corporation cross-complained against the individual, alleging breach of the agreement by the individual. A second corporation brought an action against the partnership to recover damages for work performed and for supplies. The actions were tried together in Guam. Products Co. appealed, claiming that the court erred in not changing the venue to the District Court of Washington. American Pacific Dairy Products 234 F.2d at 77.

The 9th Circuit Court held that the District Court did not abuse its discretion in refusing to transfer the Guam case to Washington. The 9th Circuit Court reasoned that most of the witnesses were on Guam, as compared to only corporate records being in the State of Washington. Id. at 78.

In the LADCO case, not only are LADCO's relevant documents relatively easy to ship to the Northern Mariana Islands, and the witnesses are largely from Saipan, but the Commonwealth Health Center stands permanently affixed to Saipan's soil. Venue is proper in Saipan, and transferring venue would work a significant burden on a majority of the involved people and witnesses to this litigation. For inconvenience to a majority of

individuals, and for important public interest considerations, venue should not be transferred.

The <u>Motion to Change Venue</u> has failed to carry its burden of making a strong showing of inconvenience of parties and witnesses such that the interest of justice would be impeded by leaving the venue of the Plaintiff's selection.

An additional matter, unrelated to inconvenience to parties and witnesses, is also including in the <u>Motion for Change of Venue</u>. The <u>Motion</u> argues that transferring venue is in the interest of justice "due to the presumed prejudice arising from jury bias created by the negative, pre-litigation media attention," as well as the fact that CNMI employs a number of local residents. <u>See</u> <u>Motion</u> at page 8.

The <u>Motion</u> argues that Saipan has been saturated with prejudicial and inflammatory coverage in this matter. <u>See</u> <u>Motion</u> at page 9, citing to <u>Harris v. Pulley</u>. Attached to its <u>Motion</u> are exhibits C, D. and E that provide copies of articles from <u>Marianas Variety</u> and the <u>Saipan Tribune</u>. Of the 21 articles provided by Defendant, none can be described as inflammatory to any degree whatsoever. Rather, a careful review of the articles indicates that the articles can be reasonably described as being either completely (1) neutral, (2) balanced in presentation, or as implying (3) some possible negative publicity on the part of individuals or agencies. Nor are the few articles what could reasonably be described as amounting to a "saturation."

The articles dating from 2002 through 2007 cannot be seriously considered to be recent material that would be on the minds of prospective jurors as this case approaches trial, possibly in 2010 or later. A close look at exhibits C,D, and E provides better focus on this matter.

Taking the dated articles chronologically, the Saipan Tribune article dated **October 26, 2002**, was neutral in content, reporting only that "some additions and deletions" were to be made on the project.

Likewise, an article dated **November 8, 2002**, discussed what it termed as several capital improvement projects [CIP] calling for an inspection of several agencies handling CIPs. This article was neutral to all of the parties and all subjects potentially included in the present litigation.

The **February 7, 2003**, article was similarly neutral, reporting only that the Commonwealth Health Center [CHC] was undergoing an expansion of its dialysis center, which would add 24 dialysis stations to the then-existing 14.

Also, the **June 10, 2003** article can be described as neutral, reporting that a new treatment and training center had been opened.

A **September 2, 2003**, article offered what can arguably be viewed as comments with a negative component, including a reference to "faulty design," stating that the "design was problematic," and with one opinion regarding a "bad design to begin with." Although this article did not balance out the few negative comments with opposing opinions, so that it cannot be described as a balanced treatment, it can certainly not be described as inflammatory or in any way as prejudicing the minds of prospective jurors selected some seven years after the date of publication

The **January 31, 2004**, article offered a balanced report, stating that the project had "some design related problems," balanced with reports that the project is "still on schedule," and "it's moving forward." This article mentioned "the design problem," but included information identifying the "problem" as being that the original contract did not

happen to include the construction of parking lots and a water system.

The **March 4, 2004**, article can be described as both neutral, as well as balanced. The information contained in this article included that a funding shortfall had existed, in part, because the funding did not take into consideration that furnishings and equipment had to also be purchased, as well as not considering the added cost of training patients in dialysis and improving staff capabilities. A comment placed toward the conclusion of this article stated that the project might not be done on time due to "faulty design."

A fairly negative article dated **October 30, 2004**, reported on a "hemodialysis fiasco." However, a careful reading of this article indicates that the "fiasco" revolved around a funding shortfall, and questions about approval of change orders that exceeded the original funding level. The reporting mainly implied criticism, not of the design contractor, but of the fact that funds were depleted because of not following proper procedures. Some comments potentially negative of the Defendant in this article state that the change orders were to correct certain design defects, as well as unforeseen circumstances due to the Defendant's unacceptable work, which caused the government to enter into a redesign project. Again, this article from more than five years ago cannot be described in any sense as inflammatory to the public and likely to create bias in future prospective jurors.

The **November 2, 2004**, article can be described as negative mainly of public entities, and not of the Defendant. Catch phrases of "hemodialysis construction fiasco" and "construction mess" were a lead-in to an article reporting on the introduction into the legislature of a new bill titled "Works Improvement Act of 2004". According to the article, the intent of the bill was to improve the inadequate protections afforded to

contractors and merchants through mechanic's liens. This article mentioned also that, in the view of Representative Seman, the existing rules did not provide for safeguards against public entities that fail to comply with the terms of construction contracts. Although this article implies negative attributes to public entities, it is not even slightly critical of the Defendant.

Similarly, the article dated **December 14, 2004**, was balanced, but with some negative comments aimed at the Department of Public Works [DPW]. Referencing a "controversial hemodialysis project," the article reported on a legislative request of the DPW to produce all of its documents in response to a legislative inquiry about whether any person or entity should be held accountable for the budget shortfall. Again, on balance, the conclusion of the article referenced change orders occasioned by a faulty design. In the main, this article reported on questions about DPW's compliance with accounting procedures.

The **December 24, 2004**, article was neutral toward the Defendant, but included some negative comment regarding the United States Army Corps of Engineers, noting that the completion of the project was delayed, and an investigation was underway to answer questions about the procurement process of the Corps of Engineers. The article noted that the Corps may be conflicted with the Hawaii-based designer. The article, which mainly suggested impropriety on the part of the Corps of Engineers, did not mention the Defendant/design contractor by name.

More than a year and a half later, a balanced article was published on **July 28, 2006**. The article reported on funding shortages and other problems. Funding problems mentioned included that it was later realized that additional funds would be required for a

11

water system and for parking, beyond those funds budgeted. On balance, it was also mentioned toward the conclusion of the article that "mistakes in the design" added to the costs. Again, not only is the Defendant not named in this article, but the budgetary problems were stated to be related to a number of problems other than design mistakes.

A neutral article dated **October 18, 2006**, reported somewhat negatively on the Department of Public Health [DPH]. Initially, the article reported that a new hemodialysis center was originally intended, but the "project ended up including additional out-patient clinics, a state-of-the-art command center in case of a disaster, soundproof conference rooms, spacious medical records and supply rooms and administrative offices that have individual shower rooms." Comments that could be construed as critical of the DPH were that record keeping violations were, in the words of the Public Health Secretary, being committed at that time, and were "piling up." Again, it is to be noted that this publicity did not report negatively on the Defendant, and was negative only with regard to some presumed deficiencies on the part of the DPH.

The article dated **December 20, 2007**, was mainly neutral in that it reported on the completion and official opening of the new wing of the CHC. A vague statement regarding overcoming "enormous challenges and complications presented by [the] project" was included, but the article continued on by reporting on the impressive features of the building, and also on the genesis of the project. This article was not negative to any degree of the Defendant and did not constitute negative publicity of any of the parties to the litigation in the above-captioned matter.

More relevant to the state of mind of prospective jurors in this case are six articles that appeared in 2009. None of the six articles can be reasonably described as

inflammatory. Only two of the articles in 2009 can be characterized as constituting arguably negative comments to the Defendant/design contractor.

A **June 6, 2009**, neutral article reported that there was an apparently forged certification of the reverse water system to the dialysis center. The possibly forgery was attributed to an unnamed subcontractor. The article also discussed that the center was completed by AIC Marianas, but that the cost of the project ballooned due to change orders made necessary because of design changes. The forgery is not mentioned in connection with the Defendant or the Defendant's work on the project, and cannot be viewed as negative publicity that would bias prospective jurors against the Defendant.

A **June 12, 2009**, article quoted the Governor as stating that the project had turned into "political football." The administration was reportedly considering litigation to correct the facility's technical problems. On balance, this article also mentioned other problems, e.g. the forging of the certification of the reverse osmosis system, that the contract was signed and executed by a previous administration, and that the DPW was the expenditure authority. It was also stated in this article that the initial design had been completely changed until a third architectural and engineering firm entered into the picture.

Another article also dated **June 12, 2009**, presented a balanced report that was not slanted against the Defendant in the least. The present administration was reportedly going to sue design contractors and other possible parties over what was being described as a "cost fiasco." Although it was reported that there were three architectural design contractors involved, only the Defendant and Taniguchi Ruth Architects were named as being involved with the project. The project was described by the Governor, who was

also a former Representative, as a "fiasco" because the initial design was completely changed after a new design firm was hired. The Governor also stated that the project was "doomed from the start." The reasons for this remark were listed as being a disregard of legal authority to authorize a contract against a lack of funding, and that the contractors substituted project experts without going through the proper approval process, as well as "some technical problems associated with the construction." On balance, it should be pointed out that the article did not report negatively on any one participant in the project, but appeared to evenly distribute blame to a number of causes of the problems.

A **June 16, 2009**, article again reported on the project, stating that a $10 million lawsuit had been filed. The article accurately recited the allegations in the Complaint against the Defendant. In addition, comments from the attorney for the Plaintiff were included that the Defendant did substandard work amounting to design deficiencies. Because the reporting did not get a corresponding comment from the Defendant's representative, the article lacked balance. However, the reporting cannot reasonably be described as inflammatory. It should also be noted that ordinary readers of the Saipan Tribune can be credited with having enough discernment to recognize that press comments from the Plaintiff's attorney do not state the whole case and are not to be viewed as a final legal or factual decision.

A somewhat negative article appeared on **June 17, 2009**. The article reported negatively on the DPW, the government contracting officials, and the U.S. Department of Interior's Office of Insular Affairs, stating that no official had yet been held accountable for the deficient evaluation of proposals, the deficient design contracts, the inadequate cost analysis, the poor contract negotiations, and the violations of procurement rules and

laws. In no measure, however, were the comments in this article negative of the Defendant.

Finally, on **June 19, 2009**, an article appearing in Mariana Variety included in its headline the phrase "dialysis center fiasco." The article went on to report that the administration hoped for a court resolution of the dialysis project, which could not be used for three years due to "faulty design." The article also stated that more parties were expected to be implicated in the case against the Defendant, who was also there identified as the first designer of the project. It was also reported that the government was seeking $10 million in damages from the Defendant, presumably related to the eventual construction cost as compared with the initially projected cost. The article cannot be described as fully balanced only because it did not include any opposing comments. More important to the Defendant's Motion now pending before the court, the June 19, 2009, article did not inflame passions against the Defendant, but responsibly reported the administration's purpose in filing the suit.

Taken in total, the majority of the articles included in the Defendant's appendices to the Motion comprise totally balanced reporting, or reporting that is entirely neutral in contributing to the public's potential perception of the Defendant in this litigation. None of the articles amount to inflammatory publicity against any parties, or even against any other non-involved individuals or agencies. The six articles dating from 2009 are largely benign. Moreover, the circulation of the Marianas Variety is 3,750, and the Saipan Tribune has a circulation of 3,500.[5] The circulation of these daily newspapers is very limited, especially considering that the total labor force for the Northern Mariana Islands

---

[5] See http://uqconnect.net/~zzslayto/cnmi.html, last visited November 6, 2009.

15

is approximately 39,000. And, there is no reason to believe that every reader has even read the few articles cited in the Motion for Change of Venue.

If pretrial publicity makes it impossible to seat an impartial jury, then the trial judge must grant the motion for a change of venue. Gotbaum v. City of Phoenix, 617 F.Supp.2d 878, 881 (D. Arizona 2008)(denying 28 USCA § 1404(a) motion to transfer venue and citing Casey v. Moore, 386 F.3d 896 906 (9th Cir. 2004)). Courts considering a change of venue based on pretrial publicity have recognized two kinds of jury prejudice: presumed prejudice, and actual prejudice.[6] The Motion for Change of Venue is of the former.

The "presumed prejudice" argument is one that is rarely applicable and is reserved for "an extreme situation."[7] Essentially, the Defendant is arguing that the Northern Mariana Islands community has been thoroughly saturated with prejudicial and inflammatory media publicity and is not competent to listen and follow the court's instructions and serve without bias. Contrary to what the Motion suggests, however, the court should presume prejudice only where the community has been utterly corrupted by press coverage.[8] Such is not the case here, as the exhibits to the Defendant's Motion make plain. Moreover, as a general rule, the effect of pretrial publicity can be better determined after the voir dire examination of jurors.[9]

In order to beef up its "presumed prejudice" argument, the Motion states that

---

[6] Harris v. Pulley, 885 P.2d 1354, 1361, 1363 (9th Cir. 1988).

[7] Harris, 885 P.2d at 1361.

[8] L.A. Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381, 1400 (9th Cir. 1984).

[9] Narten v. Eyman, 460 F.2d 184, 187 (9th Cir. 1969).

CNMI is a major employer of the populace. See Motion at 18. Attached to the Defendant's Motion is Exhibit B, which provides 2005 population figures for the Commonwealth, as well as labor force and employment numbers. According to the 2005 figures, the total labor force[10] of 38,935 includes 3,186 persons employed in government. According to these numbers, 8% of the total labor force in the Commonwealth of the Northern Mariana Islands works in government employment.

Scant legal citation accompanies the Defendant's argument regarding a presumption of bias in jurors who are employed with the government.[11] A California statute eliminating venue in the county or city of the plaintiff when the plaintiff is the county or city is neither persuasive nor controlling. And, Withrow is easily distinguishable. See footnote 10. In the Ninth Circuit, however, it has been stated that the court should hesitate to form categories of relationships that bar jurors from serving in certain types of trial; in most cases voir dire should suffice to identify juror bias; and, juror bias will not be presumed merely because a juror works in law enforcement or is a federal government employee. See Tinsley v. Borg, 895 F.2d 520, 528-29 (9th Cir. 1990)

---

[10] The total labor force includes the total of employed, as well as unemployed persons.

[11] The Motion, at page 18, cites to Withrow v. Larkin, 421 U.S. 35, 37 (1975). In discussing cases operating under the Administrative Procedures Act, the Withrow Court states that some cases have found a high probability of actual bias where the fact finder has a pecuniary interest in the outcome. Although the above-captioned matter is not an administrative procedure, Plaintiff would agree that any individual juror who is found during voir dire to have actual bias should be excused. Plaintiff does not agree, however, that government workers have a per se "pecuniary interest in the outcome" of the case simply by virtue of their being in government employment.

(An appeal based on a claim of presumed bias in a federal habeas petition).

It is respectfully submitted that the Motion for Change of Venue must be denied.

## Conclusion

The Defendant's Motion to Dismiss or, in the Alternative, Motion for More Definite Statement should be denied as unnecessary in view of the Plaintiff's Amended Complaint, filed contemporaneously with the Opposition.

The Motion for Change of Venue must be denied in favor of the Plaintiff's original choice of venue, and in furtherance of convenience to parties and witnesses, as well as in furtherance of the interests of justice. The Defendant has failed to carry its burden of making a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum. The Defendant has also not addressed the eight factors set forth in Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09 (1947). The argument for finding presumed bias on the part of the citizens of the Northern Mariana Islands must be rejected as entirely unsupported by the evidence, and not in keeping with the law of this Circuit.

RESPECTFULLY SUBMITTED this 10th day of November, 2009.

/s/
MATTHEW T. GREGORY (F0205)
Law Office of Matthew T. Gregory, LLC
PMB 419 Box 10000
Saipan, MP 96950
Phone:  (670) 234-9006
Fax:  (670) 235-9007
matt@gregoryfirm.com

1    /s/
    WILLIAM R. SATTERBERG, JR. (F0381)
2    Law Offices of William R. Satterberg, Jr.
    PMB 131Box 10000
3    Saipan, MP 96950
    Phone:  (670) 234-9005
4    Fax:  (670) 235-9007
    bill@satterberg.net
5

6

7

8  :wd